RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BILLY S. JEFFRIES,

　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

JAMES L. MORGAN, in his official capacity as
Warden of the Northpoint Training Center,

　　　　　　　　*Respondent-Appellee.*

No. 06-5726

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 05-00066—Karen K. Caldwell, District Judge.

Argued:  February 5, 2008

Decided and Filed:  April 14, 2008

Before:  MARTIN and SUTTON, Circuit Judges; OBERDORFER, District Judge.[*]

―――――――――――

**COUNSEL**

―――――――――――

**ARGUED:** Timothy G. Arnold, DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, for Appellant.  David W. Barr, OFFICE OF THE ATTORNEY GENERAL, COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Appellee.  **ON BRIEF:**  Timothy G. Arnold, DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, for Appellant. Louis F. Mathias, Jr., OFFICE OF THE ATTORNEY GENERAL, COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Appellee.

―――――――――――

**OPINION**

―――――――――――

　　　BOYCE F. MARTIN, JR., Circuit Judge.  Billy S. Jeffries appeals the district court's denial of his petition for habeas corpus seeking to overturn his conviction for murder and attempted rape based on evidence discovered subsequent to trial that implicates another person, John Dillon, in the crime.  The issues on appeal are whether the district court erred in holding that:  (1) upholding the Kentucky Supreme Court's decision that the evidence introduced at trial was sufficient to support a conviction; (2) affirming the Kentucky Court of Appeals' decision that the Commonwealth's

---

[*]The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

failure to turn over the limited information it had about Dillon to the defense did not give rise to a *Brady v. Maryland* claim; and (3) denying as moot Jeffries' motion to expand the record and compel the Commonwealth to produce the transcripts of the trial. We now find that the district court erred in denying Jeffries' motion to expand the record. Therefore, we VACATE the district court's denial of habeas corpus, REVERSE the denial of Jeffries' motion to expand the record, and REMAND with instructions that the district court review the entire available record in assessing Jeffries' petition.

I.

A.  Factual Background

1.  Trial and Direct Appeal

The Kentucky Supreme Court summarized the evidence presented at trial as follows:

> On February 20, 1995, Mary McKee left her house for a walk and never returned. The next day, her housekeeper became alarmed when Mrs. McKee failed to answer her door. The housekeeper contacted a neighbor. A search was conducted and Mrs. McKee's body was discovered in a yard between two houses. Her pantyhose and panties had been removed, her longish skirt was hiked up to her mid-thigh, and her blouse was ripped partially open. Blood was splattered on a nearby wall and teeth fragments were scattered near the body. There were smeared fingerprints on Mrs. McKee's right thigh and buttocks. According to the medical examiner, Mrs. McKee was beaten to death, apparently with the bloody rocks found near her body. Further, the medical examiner testified that Mrs. McKee did not die immediately from the beating but probably expired some twenty minutes thereafter.
>
> On February 27, 1995, Jeffries was questioned by the police about Mrs. McKee's murder and turned over the clothes he was wearing on the day of the murder. Tests revealed the presence of blood on his jacket, sole of his shoe, and inside the tongue of his right shoe. There was no identification as to whom the blood on his jacket and the sole of his shoe belonged or whether it was even human blood. However, the blood found on the inside of the tongue of Jeffries' shoe was positively identified as Mrs. McKee's. Further, a palm print on Mrs. McKee's glasses, which were found next to her body, was positively identified as belonging to Jeffries. Finally, witnesses testified that they saw Jeffries in the general area where Mrs. McKee's body was found.
>
> Upon questioning, Jeffries denied all knowledge of the crime. However, when he took the stand, he testified that he had lied to the police when they questioned him. Contrary to his earlier statements, he testified that on the evening of the murder he had been cutting through the yard in question and had tripped over a body. He testified that he could not even identify the gender of the body. He ran away because he was scared. He never checked on the well-being of the person he tripped over. He did not tell his mother or his father about tripping over the body, apparently because his parents were mad at him and telling them would require a confession that he had been drinking that day.

Also introduced at trial were the results of a forensic examination, which discovered a hair matching neither Jeffries nor McKee inside her underpants and fibers on the body that did not come from either McKee's or Jeffries' clothes. On March 21, 1997, the jury convicted Jeffries based on this evidence. On June 9, 1997, Jeffries was sentenced to thirty-five years in prison.

On direct appeal, Jeffries argued that the evidence was insufficient to support his conviction. On October 15, 1998, the Kentucky Supreme Court, in an unpublished opinion, rejected this argument and affirmed his conviction. With respect to the attempted rape charge, the court held:

> The overt acts in this case are those that led to the discovery of Mrs. McKee on her back with her undergarments removed, her skirt pushed up, her blouse torn partially open, and with smeared fingerprints on her thigh and buttocks. The circumstances of the case are that the brutal attack on Mrs. McKee occurred in a yard away from the street, out of sight.

Concerning the issue of the identity of the killer, the court cited the blood found on Jeffries' clothes, especially the drop matching McKee's blood on the tongue of his shoe, Jeffries' palm print on her glasses, witness testimony placing him near the crime scene and stating that he was mud-covered, evidence that his clothes had been laundered, and inconsistency between Jeffries' testimony at trial and his statement to police as evidence of Jeffries' guilt.

### 2.  Information Discovered After Trial

In March 1998, Jeffries' counsel received a letter from the Kentucky Attorney General listing the results of an investigation into various third-party statements that John Dillon had admitted his involvement in McKee's murder, including the following:  (1) on June 10, 1997, the day after the sentencing, Chris Beach, at the time a prisoner in jail, told a police detective that he had in the past heard Joe Buck Dixon refer to Dillon as a rapist and that he, Tyrus Beach, and Annette Clark heard Dillon tell a girl named Tammy:  "The old lady kept screaming.  When he got done I was going to take my turn.  She kept screaming.  I had to kill the old bitch.";  (2) on or about June 12, 1997, Linda Raisor told a detective that Pocahontas Biggers (Dillon's aunt) had told her three months ago that Dillon had admitted murdering McKee; (3) on June 24, 1997, Tiffany Solace told a sheriff's deputy that Dillon killed McKee, but provided no basis for her belief; and (4) on January 22, 1998, Tammy and Kim Chesser told a person in a judge's office that Dillon had threatened Nikki Chesser in connection with the case.  None of these statements were known to the Commonwealth before Jeffries' trial.

On June 9, 1998, in response to this letter, Jeffries moved for a new trial in the trial court based on newly discovered evidence.  He attached two affidavits to his motion:  (1) Nikki Chesser's affidavit stating that Dillon admitted killing McKee and threatened Chesser not to tell anyone about it; and (2) Beach's affidavit that he overheard Dillon publicly declare his involvement in a killing, stating "I don't remember if he said I did not mean to kill her or we did not mean to kill her.  But after that he was real scared and crying."

A detective Pratt interviewed Dillon after Jeffries' trial concerning these allegations.  During this interview, Dillon stated that he was with a girlfriend at the time of the killings.  Pratt testified at a hearing on the motion for a new trial that Dillon told him the girlfriend's name was Jessica Peyton.  Peyton testified before a grand jury that she was 11 years old at the time of McKee's murder, did not live in the county where the murder occurred at the time of the offense, was never romantically involved with Dillon, and was not with him at the time of the offense.

Jeffries presented two legal theories concerning why this new evidence warranted a new trial. First, he argued that the evidence discovered and disclosed by the Commonwealth after trial and evidence that the defense might discover after additional investigation made it reasonably certain that a new trial would have a different result.  Second, he argued, based on counsel's understanding at that time that the Commonwealth knew that third parties had heard Dillon claim responsibility for the killing before the trial, that the Commonwealth had failed to turn over exculpatory evidence to Jeffries in violation of his rights under *Brady*.  During discovery on this motion, the situation was

clarified: the Commonwealth had not known before the trial about the third-party accounts of Dillon's statements, but it had failed to turn over some information about Dillon that it did possess before trial.

The Commonwealth had briefly investigated Dillon soon after the murder. A probation officer had spotted Dillon with a white teenager (not Jeffries) 7/10ths of a mile from where the body was found about half an hour before the crime was committed. Detective Rick Barbiarz interviewed Dillon, who claimed that he was with his girlfriend at the time of the killing. There is no record that anyone ever checked on Dillon's alibi. Based on Dillon's statements and the statement of his grandmother that she was keeping Dillon on a "tight leash," Barbiarz cleared Dillon as a suspect. In the motion hearing, Babiarz testified that he did not consider Dillon a suspect and that he was not sure if the interview had been taped.

Before the trial, Jeffries' counsel requested a list of all individuals the police questioned during the investigation, including all related notes and recordings. In its response to this request, the Commonwealth failed to include the information about Dillon in the list of suspects it had cleared. Jeffries thus modified the theory of his *Brady* claim, arguing that the information the Commonwealth had about Dillon pretrial was exculpatory, because it would have led the defense to discover the witnesses to Dillon's statements admitting to the murder and weaknesses in Dillon's alibi, all of which would have strengthened Jeffries' defense that he had stumbled across the body after the killing. The trial court denied the motion for a new trial, and, on October 17, 2003, the Kentucky Court of Appeals affirmed. In addressing the *Brady* claim, the court stated that

> If the exculpatory evidence was available to the prosecution before the trial, we would have no reluctance in reversing and remanding for a new trial. . . . What we have in the current situation is the suppression of the name and interview of a suspect before trial. Neither the name nor the results of the interview are in themselves exculpatory. This case is similar to *Wood v. Bartholomew*, wherein the Supreme Court quoted (with approval) the Federal District Court's analysis of the suppressed evidence as being not exculpatory evidence but "*[t]he information withheld only possibly could have led to some admissible evidence.*" *Wood*, 516 U.S. [1,] 5 [(1995)] (emphasis in original).

## B. Procedural History

On September 19, 2005, Jeffries filed his petition for a writ of habeas corpus, raising two grounds: (1) the prosecutor's failure to turn over the name and alibi of a person interviewed during the investigation violated his rights under *Brady*, and (2) the evidence introduced at trial was insufficient to support a conviction.

On November 22, 2005, the Commonwealth moved to dismiss the petition as procedurally defaulted and on the merits. The Commonwealth included the written state trial court record; this record did not include the transcript of the trial.

On December 22, 2005, Jeffries moved to compel production of the state trial court record. The court submitted this motion to a magistrate judge for review. On February 3, 2006, the magistrate judge ordered the Commonwealth to produce a list of all available transcripts and portions of the trial for which only video, not transcripts, were available.

On March 20, 2006, Jeffries moved for leave to expand the state court record. On April 11, 2006, the magistrate judge issued a report and recommendation denying Jeffries' grounds for habeas relief on the merits and dismissing his motion to expand the record as moot.

On May 2, 2006, the district court adopted the magistrate judge's report and recommendation as the opinion of the court over Jeffries' objection and entered final judgment dismissing the petition with prejudice.

On May 30, 2006, Jeffries filed an application for certificate of appealability for the district court's denial of his Brady claim, his sufficiency of the evidence claim, and his motion to expand the record. On October 17, 2006, the district court granted a certificate of appealability on the Brady claim but denied the application for the other two claims.

On January 17, 2007, this Court expanded the certificate of appealability to include the other two claims.

## II.

### A.  Standard of Review

Our standard of review for petitions for habeas corpus relief from state-court determinations is governed by the Antiterrorism and Effective Death Penalty Act, codified at 28 U.S.C. § 2254(d). However, because we do not reach the merits of Jeffries' petition for habeas corpus, we apply the traditional standard, and review the "district court's legal conclusions de novo, but will set aside its factual findings only if clearly erroneous." *Brown v. Palmer*, 441 F.3d 347, 350 (6th Cir. 2006).

### B.  Failure to Review the Entire State Court Trial Record

Jeffries argues that the district court erred by denying his sufficiency of the evidence and *Brady* claims without reviewing the entire record of the evidence presented at trial. Our Circuit has held that "a District Court must make a review of the entire state court trial transcript in habeas cases, and where substantial portions of that transcript were omitted before the District Court, a habeas case should be remanded to the District Court for consideration in light of the full record." *Adams v. Holland*, 330 F.3d 398, 406 (6th Cir. 2003). The Commonwealth cites a much older case, *Loveday v. Davis*, for the proposition that, when the petition does not specifically challenge the factual findings of the state court, the district court is not required to examine the transcript. 697 F.2d 135, 139 (6th Cir. 1983). While we have held that *Loveday* is still controlling in this Circuit, *see Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006), we have also explained that a constitutional sufficiency of the evidence challenge requires a careful review of the entire trial transcript by the habeas court when a petitioner disagrees with the challenged state court opinion's summary of the trial testimony or relevant facts, *Clark v. Waller*, 490 F.3d 551, 556 (6th Cir. 2007); *see also Nash*, 437 F.3d at 525 ("*Loveday* prohibits the imposition of a general rule requiring district courts to review the transcript in all cases, but it also does not prevent us from remanding for such a review if we believe that extra information is required.").

We find that both Jeffries' constitutional challenge to the sufficiency of the evidence and his *Brady* challenge require a habeas court to review the entire record of the trial in order to properly assess his habeas petition. While the state court opinions provide a summary of the facts, Jeffries "quarrel[s] with that summary." *Clark*, 490 F.3d at 556. He argues that, on direct appeal, the Kentucky Supreme Court did not give "a complete picture of the trial," and he cites evidence, such as the hair and fibers that matched neither Jeffries nor McKee, that "may be in the trial transcript but simply was not discussed in the state court's opinion[s]," *Nash*, 437 F.3d at 525; *cf. Clark*, 490 F.3d at 555 (holding that review of the transcript is not necessary because "[petitioner] does not quarrel with the state court's recitation of the relevant evidence, nor does he point to gaps in it"). Jeffries requested that the district court review the trial transcript below, and even the district court recognized that "[i]t may prove difficult to fairly evaluate Petitioner's claims without review of any of the state court trial record." Under these circumstances, we think it makes considerable sense for

the district court to examine these arguments in the light cast upon them by the *entire* record of Jeffries' state court trial.

## III.

Having found that the district court committed reversible error by not reviewing the entire trial record during its review of Jeffries' habeas petition, we need not reach the other issues raised on appeal. Accordingly, we VACATE the district court's denial of Jeffries' petition for habeas corpus, REVERSE the district court's denial of Jeffries' motion to expand the record, and REMAND with instructions that the entire trial record be reviewed by the district court in assessing Jeffries' petition.